UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| MECHANICSBURG FITNESS, INC. | : | BANKRUPTCY NO.: 1:16-bk-01897-HWV |
| d/b/a Gold's Gym, | : | |
|     DEBTOR | : | |
| | : | |
| JOYCE S. WHITELEY, | : | |
|     OBJECTOR | : | |
| | : | |
| v. | : | {**Nature of Proceeding**: Objection to Proof |
| | : | of Claim No. 1 (Hildebrand) (Doc. #74) and |
| SUSAN J. HILDEBRAND, | : | Objection to Proof of Claim No. 2 (Keefer) |
|     CLAIMANT | : | (Doc. #73)} |
|   and | : | |
| KEVIN E. KEEFER, | : | |
|     CLAIMANT | : | |

## OPINION

This matter comes before the court on two separate but substantively similar objections filed by Joyce S. Whiteley[1] to Proofs of Claim filed by Susan J. Hildebrand and Kevin E. Keefer (the "Objections"). Hildebrand and Keefer (the "Claimants") are represented by common counsel and have filed identical responses to the Objections. The Chapter 7 Trustee has also filed a response.[2] While perhaps not entirely unprecedented, the Chapter 7 Trustee has postured himself in the rare position of joining with the Claimants in their common defense to the Objections. *In re Quintero*, 513 B.R. 127, 134 (Bkrtcy. D.NM 2014).

---

[1] By an Opinion and Order both dated Novembers 2, 2018, the court found that Whiteley was a party in interest and therefore authorized pursuant to 11 U.S.C. § 502(a) to object to the subject proofs of claim.

[2] The Trustee's responses at Doc. #75 - #76 request the Court to enter an Order denying or dismissing the objections. However, the Trustee clarified his position at the hearing by indicating that he really wasn't challenging the objections to the claims but, rather, was supporting the claims. Hr'g. Tr. 18:10-20 Jan. 8, 2019, ECF No. 82.

## I. Jurisdiction

This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. §§ 151, 157(b)(2)(A) and 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §1409(a).

## II. Factual Background and Procedural History

Mechanicsburg Fitness, Inc. d/b/a Gold's Gym (the "Debtor") is a Pennsylvania corporation formed by Whiteley prior to March 15, 2004. The Debtor was formed for the purpose of operating a fitness center located in Camp Hill, Pennsylvania (the "Fitness Center"). To facilitate this purpose, the Debtor entered into two independent contractor personal trainer agreements (the "Agreements") with the Claimants on March 15, 2004.[3] Pursuant to the Agreements, the Claimants were authorized to conduct business and to provide services to clients and members of the Debtor's Fitness Center. The "term" of each Agreement is set by the first sentence of paragraph five therein (the "Term"), which also requires the Debtor to assign each Agreement to a new owner or operator if certain conditions are met. The first sentence of paragraph five reads as follows:

> The term of this Agreement shall be for so long as the Club remains in business, and shall be assigned by Club to any new owner or operator in the event of a sale, transfer or other change of control in the ownership or operation of the Club.

See Hr'g. Tr. Ex.'s C-1 and C-2 ¶5. The Debtor and the Claimants appear to have substantially performed under the Agreements for the next ten years without relevant incident.

On September 4, 2014, the Debtor entered into an asset purchase agreement with Linglestown Family Fitness ("Linglestown") pursuant to which the Debtor agreed to sell its assets to Linglestown. Settlement on the sale of the Debtor's assets appears to have occurred

---

[3] All parties agree that the Claimants were not employees of the Debtor but, rather, were providing services as independent contractors. See Hr'g. Tr. 33-36, Jan. 8, 2019, ECF No. 82.

contemporaneous with execution of the asset purchase agreement ("Settlement"). The Debtor did not assign the Agreements to Linglestown at Settlement. Nearly four months later, on December 31, 2014, the Claimants filed a civil complaint (the "State Court Complaint") against the Debtor in the Cumberland County Court of Common Pleas (the "State Court Matter"). In the State Court Complaint, the Claimants assert that the Debtor breached the Agreements by failing to assign them to Linglestown at Settlement as required by paragraph five therein, and that the breach caused them damages for which they were entitled to recovery. The Debtor responded by filing preliminary objections to the State Court Complaint, which were overruled without opinion on April 29, 2015. Thereafter, the Debtor filed an answer with new matter to the State Court Complaint, to which the Claimants responded. The Debtor filed bankruptcy before the State Court Matter could proceed further. The Trustee was appointed and a section 341 meeting date was set.

Following the conclusion of the section 341 meeting, the Trustee filed a Notice of Change from a No Asset Case to an Asset Case (the "Asset Notice"). The Asset Notice instructed creditors to file a proof of claim on or before October 6, 2017 if they wished to share in the distribution of funds. Three timely claims were filed in response to the Asset Notice. The first was filed by Hildebrand asserting a general unsecured claim in the amount of $130,950.00 (the "Hildebrand Claim"). The basis of the Hildebrand Claim is breach of the Agreements arising from the same facts and circumstances asserted in the State Court Complaint. The second claim was filed by Keefer asserting a general unsecured claim in the amount of $283,240.00 on similar grounds as the Hildebrand Claim (the "Keefer Claim"). The third and final claim was filed by Whiteley asserting a general unsecured claim in the amount of $1,973,856.21 for money loaned (the "Whiteley Claim").

3

On January 19, 2018, Whiteley filed a Motion Seeking Leave to Object to the Hildebrand and Keefer Proofs of Claim (the "Motion Seeking Leave"), to which the Trustee responded (the "Response"). On April 25, 2018, the Trustee filed an adversary complaint pursuant to sections 548 and 550 naming Whiteley as Defendant (the "Adversary Complaint"). On June 26, 2018, a hearing on the Motion Seeking Leave and the Response thereto was held after which the matter was taken under advisement.

On November 2, 2018, this court entered an order granting the Motion Seeking Leave and authorizing Whiteley to file objections to the Hildebrand and Keefer Claims (collectively, the "Claims"). Whiteley filed her Objections on November 6, 2018. The Claimants and the Trustee responded to the Objections and a hearing was held on January 8, 2019. Following that hearing, the parties were invited to submit briefs and legal memoranda on the matter, which they have done.[4] This matter is now ripe for a decision.

### III. Discussion

In her Objections and supporting memorandum, Whiteley advances three primary arguments to support her request to disallow the Claims in their entirety. First, Whiteley argues that the Agreements were terminable at will under Pennsylvania law and that they were therefore automatically and properly terminated at Settlement. Second, and in the alternative, Whiteley argues impossibility of performance as a defense to the enforceability of the assignment language found in paragraph five of the Agreements. Third, Whiteley argues that the Debtor was excused from performance under the Agreements because of a prior breach by each Claimant. For the

---

[4] Memorandum of Joyce S. Whiteley (ECF No. 83) (the "Whiteley Memorandum"); Memorandum of Susan J. Hildebrand and Kevin E. Keefer (ECF No. 84) (the "Claimants' Memorandum"); and Trustee's Brief Regarding Whiteley's Objection to Claims of Susan J. Hildebrand and Kevin E. Keefer (ECF No. 85) (the "Trustee's Brief").

4

reasons that follow, the court will sustain the Objections to the Claims after consideration of Whiteley's first argument, though it will do so on separate grounds.

Whiteley's chief argument is that the Term of each Agreement is indefinite and therefore terminable at will under Pennsylvania law. In support of her position, Whiteley cites to Pennsylvania case law for the general rule "that when a contract provides that one party shall render services to another . . . but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will." *Cummings v. Kelling Nut Co.*, 84 A.2d 323, 325 (Pa. 1951). Because the Agreements are terminable at will, argues Whiteley, they were automatically terminated without breach at Settlement. Not surprisingly, the Claimants and the Trustee disagree. Here, the Claimants and the Trustee contend that the Term of each Agreement is not indefinite as argued by Whiteley, and therefore the Agreements are enforceable as written. Because the Term of each Agreement is enforceable, the Debtor breached both of them when it failed to assign them to Linglestown at Settlement. The damages flowing from this breach form the basis of each Claim.

In the alternative, the Claimants and the Trustee argue that even if the Term of each of the Agreements is found to be indefinite, Whiteley's assertion that they are therefore terminable at will "is an oversimplification of Pennsylvania contract law." Claimants' Memo. 2, ECF No. 84. Instead, they argue that the applicable standard under Pennsylvania law for the interpretation of a contract that does not specify a definite term is to construe the term as being "for a reasonable time." *Id*. In support of this position, the Claimants and the Trustee cite to Pennsylvania case law for the proposition that "[i]n general, a contract for an indefinite period will be construed to be for a 'reasonable time or terminable at will unless the intention of the parties can be ascertained.'" *Wyeth Pharmaceuticals, Inc. v. Borough of West Chester*, 126 A.3d 1055, 1064 (Pa. Commw.

5

Case 1:16-bk-01897-HWV    Doc 86    Filed 05/10/19    Entered 05/10/19 11:40:34    Desc
Main Document    Page 5 of 18

2015) (citing *Major v. Flock Brewing Co.*, 2 Pa. D&C 2d 496, 500 (Lycoming Ct. Com.Pl. 1954). Under this standard, and the facts presented here, the Claimants and the Trustee submit that this court can readily ascertain that the parties intended for each Agreement to remain in effect as long as a club (presumably a "Gold's Gym") remained in business at that particular location, even if the current owner of the club sold it to another party. Trustee's Br. 4, ECF No. 85.

It is not surprising to observe that the positions taken by the opposing parties in this matter are mutually exclusive and cannot both simultaneously be correct. What is surprising, however, is that examination of the Agreements within the context of Pennsylvania case law reveals that the positions argued here are not helpful to a proper resolution of this matter. This court finds that the clear and unambiguous language of each Agreement establishes that the duty to transfer the Agreements was not triggered by Settlement on September 4, 2014. Because of this, the Debtor did not breach the Agreements by failing to assign them at that time. Since there was no breach, there can be no damages due to the Claimants under the Agreements and the Objections must therefore be sustained.

It is well settled under Pennsylvania law that the "paramount goal of contract interpretation is to determine the intent of the parties.'" *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.*, 273 F.3d 332, 335 (3d Cir. 2001) (citation omitted)). It is equally resolved that Pennsylvania contract law begins with the firmly settled principle that "the intent of the parties to a written contract is contained in the writing itself." *Krizovensky v. Krizovensky,* 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (citing *Steuart v. McChesney,* 444 A.2d 659, 661 (Pa. 1982)). Where the words are clear and unambiguous, the intent of the parties must be determined from "the express language of the agreement" and there is no need to resort to extrinsic aids or evidence. *Steuart*, 444 A.2d at 661.

6

Indeed, "the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id*. A contractual provision is ambiguous under Pennsylvania law only where the disputed language "is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one." *Samuel Rappaport Family Partnership v. Meridian Bank*, 657 A.2d 17, 21–22 (Pa. Super. Ct. 1995) (quoting *Z & L Lumber Co. of Atlasburg v. Nordquist*, 502 A.2d 697, 700 (Pa. Super. Ct. 1985)). A writing is also ambiguous when it is "obscure in meaning through indefiniteness of expression or has a double meaning." *Id*.

As a preliminary matter, therefore, courts interpreting a writing must determine which category it falls into—clear or ambiguous. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994). The Supreme Court of Pennsylvania has identified two kinds of ambiguity: (1) patent ambiguity; and (2) latent ambiguity. The former appears on the face of the writing and "arises from the defective, obscure, or insensible language used" while the latter arises from "extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Id*. (quoting *Steuart,* 444 A.2d at 663) (internal quotations and citations omitted).

With the above framework in mind, the court turns to the first sentence of paragraph five of each Agreement. As stated above, the language found here sets the Term of the Agreements and governs the conditions under which the Debtor has a duty to assign them, if at all:

> The term of this Agreement shall be for so long as the Club remains in business, and shall be assigned by Club to any new owner or operator in the event of a sale, transfer or other change of control in the ownership or operation of the Club.

See Hr'g. Tr. Ex.'s C-1 and C-2 ¶5. Initially, the court detects no language in the above provision that could be reasonably susceptible of different constructions or that is capable of being

7

understood in more than one sense. The court does observe, however, that the word "Club" is capitalized and could therefore have some specific or defined meaning within the context of its use.[5] Review of each Agreement reveals that it does. The introductory paragraph of each Agreement defines the word "Club" as "Mechanicsburg Fitness Inc., d/b/a Gold's Gym." As a defined term, the language "Mechanicsburg Fitness Inc., d/b/a Gold's Gym" can therefore be substituted for the word "Club" each time it appears in the Agreements. Rewriting the provision in this manner will assist the court with its determination of whether the writing is clear or ambiguous. Doing so yields a provision that reads as follows:

> The term of this Agreement shall be for so long as *Mechanicsburg Fitness Inc., d/b/a Gold's Gym* remains in business, and shall be assigned by *Mechanicsburg Fitness Inc., d/b/a Gold's Gym* to any new owner or operator in the event of a sale, transfer or other change of control in the ownership or operation of *Mechanicsburg Fitness Inc., d/b/a Gold's Gym*.

The language of this provision is not ambiguous, defective, obscure, or insensible. Nor are there any extraneous or collateral facts in this case which make the meaning of the provision uncertain even though its language is clear and unambiguous. Because of this, the intent of the parties can clearly be determined from the express language of the provision itself and there is no need to resort to extrinsic aids or evidence.

According to the plain language of the controlling provision above, the Claimants must prove two legal issues to establish a basis for their Claims against the Debtor. First, they must prove that the Term of each Agreement was in effect at the time of Settlement. Second, they must

---

[5] The word "Agreement" is also capitalized in the provision. However, given the context of this word within the provision specifically, and within the Agreements as a whole, this court does not consider its meaning to be subject to different constructions or that it is capable of being understood in more than one sense. It clearly means the Agreement within which the word is found.

8

prove that the Debtor[6] was obligated to assign each Agreement to Linglestown at Settlement, and that it failed to do so. The court will address these legal issues in the order presented.

### A. THE TERM OF EACH AGREEMENT WAS IN EFFECT AT SETTLEMENT

The issue presented here is whether the Term of each Agreement was in effect at Settlement. The language controlling this issue is found in the first part of the first sentence of paragraph five of the Agreements, which reads as follows:

> The term of this Agreement shall be for so long as *Mechanicsburg Fitness Inc., d/b/a Gold's Gym* remains in business . . .

The above language is clear. To establish that the Agreements were in effect at the time of Settlement the Claimants need only prove that the Debtor remained in business at the time of Settlement, and that the Agreements had not otherwise been terminated. The court will address each of these issues in turn.

#### 1. The Debtor Remained in Business

While it is true that no one has affirmatively stated that the Debtor was in business at the time of Settlement, it is equally true that no one has even hinted that it was not. For example, Whiteley testified that she took great care to avoid giving the members any reason to think that the Fitness Center might close because she was concerned that "if rumors had started to swirl around about the gym going out of business, it could very well have been a self-fulfilling situation." Hr'g. Tr. 68:10-21 Jan. 8, 2019, ECF No. 82. For the same reason, Whiteley also testified that she did not tell the Claimants that she was actively seeking buyers of the assets because "[i]t is astonishing how quickly rumors about the imminent closing of a gym can affect cancellations, make other people nervous." Tr. 73:1-15. This testimony supports a finding that Whiteley did not cease

---

[6] The Debtor in this case is identified on the voluntary chapter 7 petition as "Mechanicsburg Fitness, Inc., d/b/a Gold's Gym." Therefore, the designations of "Mechanicsburg Fitness, Inc., d/b/a Gold's Gym" and "Debtor" are interchangeable.

9

operations prior to Settlement because she believed that doing so would cause irreparable harm to the business and would interfere with her ability to find a buyer. Indeed, a review of the Transcript establishes that there is other evidence to support this finding.[7]

Having established that the Debtor remained in business up to the time of Settlement, the court will now examine whether the Agreements had otherwise been terminated by any party prior to Settlement.

### 2. The Agreements were not Terminated Prior to Settlement

Whiteley admits that she did not terminate the Agreements prior to Settlement because doing so "might spark a member backlash that could possibly take us under that key membership total that could literally bring the business to a halt." Hr'g. Tr. 54:22-25; 55:1; 68:13-21, Jan. 8, 2019, ECF No. 82.[8] This testimony supports a finding that the Agreements had not been terminated by Whiteley prior to Settlement. Likewise, a review of the record demonstrates that the Claimants did not terminate the Agreements at any time. Indeed, such a termination has never been alleged.

Based upon the foregoing observations, this court has little difficulty finding that the Agreements were in effect at the time of Settlement because the Debtor remained in business at that time and the Agreements had not otherwise been terminated by any party. Next, the court will consider the second legal issue regarding whether the Debtor was obligated to assign the Agreements to Linglestown at Settlement.

---

[7] See Tr. 81:13-16; 82:9 (Amy Wolf testimony); Tr. 47:12-14 (Whiteley testimony); Tr. 86:17-24; 87:1-3 (Hildebrand testimony).
[8] See also Tr. 68:11-12 (Whiteley testifying regarding other concerns about terminating the agreements).

## B. THE DEBTOR'S OBLIGATION TO ASSIGN THE AGREEMENTS

The court concludes that the Debtor was not obligated to assign either of the Agreements to Linglestown at Settlement because the conditions required to trigger that obligation were not met. The conditions necessary to trigger the duty to assign the Agreements are set forth in the second part of the first sentence of paragraph five therein, which provides that each Agreement:

> . . . shall be assigned by *Mechanicsburg Fitness Inc., d/b/a Gold's Gym* to any new owner or operator in the event of a sale, transfer or other change of control in the ownership or operation of *Mechanicsburg Fitness Inc., d/b/a Gold's Gym*.

Once again, the court finds the above language clear and unambiguous. To establish that the Debtor had an obligation to assign the Agreements to Linglestown at Settlement, the Claimants in this case must show that Settlement resulted in either a new owner of the Debtor or a new operator of the Debtor. To prove the existence of a new owner, the Claimants must establish that Settlement was an "event of a sale, transfer or other change of control in the ownership . . . of the [Debtor]." Failing that, the Claimants must prove the existence of a new operator by demonstrating that Settlement was an "event of a sale, transfer or other change of control in the . . . operation of the [Debtor]." In the absence of proof of one of these two events, however, there can be no new owner or operator of the Debtor following Settlement and the conditions necessary to trigger the Debtor's duty to assign the Agreements will not be met.

With this context in mind, the court will now examine the transaction between the Debtor and Linglestown to determine if either of the above events occurred.[9]

---

[9] Much of the analysis that follows would not be necessary if the September 4, 2014 agreement controlling the transaction between the Debtor and Linglestown had been entered into the record. The terms of this agreement define the nature and extent of the transaction between those parties and presumably would be helpful to this court. Because of this, it is odd that no one sought to enter this agreement into the record.

### 1. Sale, Transfer or other Change of Control in Ownership of Debtor

The issue presented here is whether Settlement resulted in a new owner of the Debtor. To prove this, the Claimants must establish that Settlement was "an event of a sale, transfer or other change of control in the ownership . . . of the [Debtor]." See Hr'g. Tr. Ex.'s C-1 and C-2 ¶ 5. After reviewing the record, this court finds that Settlement was not such an event because it did not result in the sale, transfer or other change of control in the stock of the Debtor.

Stock is the ownership element in a business corporation. It is usually divided into shares which are represented by transferable stock certificates. The holders of these stock certificates are called shareholders and they are the owners of the corporation. The only way to sell, transfer or otherwise change the control of the ownership in a corporation, then, is through a sale, transfer or other change of control in the stock of that corporation. This is commonly referred to as a stock transaction. Since the buyer in a stock transaction is purchasing the ownership element of the seller corporation (or a portion thereof), the buyer generally assumes all the assets and liabilities of the seller corporation, and often takes over operation of same. Review of the record in this case, however, establishes that nothing of the kind occurred here.

Consider Whiteley's testimony at the January 8, 2019 hearing on her Objections. When Whiteley was asked to state her relationship to the Debtor, she responded, "I am the sole shareholder of Mechanicsburg Fitness." Hr'g. Tr. 38:8, Jan. 8, 2019, ECF No. 82. This testimony allows the court to infer that Whiteley was the sole shareholder of the Debtor prior to Settlement, and that she remained the sole shareholder of the Debtor following Settlement. In this sense, the court finds it significant that no one challenged Whiteley's testimony on this issue at the hearing, or at any time thereafter. The court finds it equally significant that there is no evidence in the record contradicting her testimony in this regard.

To the contrary, the evidence in this case supports a finding that the transaction between the Debtor and Linglestown was not a stock transaction at all and that it was instead an asset transaction. In a typical asset transaction, the seller's shareholders retain possession of the stock and the buyer purchases individual assets of the company, such as equipment, fixtures, leaseholds, licenses, goodwill, trade secrets, trade names, telephone numbers, and inventory. Since the buyer in an asset sale is not purchasing the ownership interests of the company, the buyer generally does not assume any liabilities of the seller and does not become an owner or operator of the selling company. The weight of the evidence in this case establishes that this is precisely what happened here.

Consider again Whiteley's testimony at the hearing on her Objections. At that hearing, Whiteley testified that following Settlement with Linglestown, "*there were no assets remaining in my company* to provide a venue for the training . . . I no longer had a lease for the facility, I no longer had equipment, I no longer had computers that could check people in. *All of the assets were transferred or were purchased under the sales agreement*." Hr'g. Tr. 56:6-11 Jan. 8 2019. (ECF No. 82). This testimony supports a finding that the Debtor sold substantially all its assets to Linglestown and that it retained insufficient assets to remain in business following Settlement. Such a finding is further supported by additional statements made by the Trustee[10] as well as statements made by Whiteley,[11] none of which were objected to by the Claimants or by the Trustee.

---

[10] See Adv. Compl. ¶ 7 (Trustee asserts that Linglestown signed a judgment note "in partial payment of the purchase price for the *sale of assets*." (emphasis added)); Adv. Compl. ¶ 24 (Trustee claims the Debtor "*sold all of its assets* and assigned its lease of the club premises to Linglestown.") (emphasis added); Adv. Compl. ¶ 6 (Trustee describes the agreement as an "*Asset Purchase Agreement* . . . pursuant to which Mechanicsburg Fitness sold its business, its business equipment, and *all other assets* to Linglestown.") (emphasis added).

[11] See Tr. 53:11-12 (Whiteley references the transaction as an "asset sale"); See Tr. 55:2 (Whiteley references Linglestown as "the prospect, who ultimately did buy the assets of the club"); See Tr. 56:10-11 Jan. 8 2019 (Whiteley testifies that "[a]ll of the assets were transferred or were purchased under the sales agreement."); See Tr. 58:11-13 (Whiteley testifies that Wolf served as the Debtor's "business manager for pretty much the whole time leading up to the asset sale.").

13

The foregoing analysis allows the court to make two important findings of fact. First, the transaction between the Debtor and Linglestown was not a stock transaction. Second, the transaction was an asset sale that involved the sale of substantially all the Debtor's assets, leaving the Debtor with insufficient assets to remain in business following Settlement. The consequence of these findings is significant. Initially, it allows the court to conclude that the Debtor ceased doing business at the moment of Settlement and that the Term of the Agreements therefore expired at that time. In addition, it means that Settlement was not an event of a sale, transfer or other change of control in the ownership of the Debtor because it did not result in the sale, transfer or other change of control in the stock of the Debtor. Therefore, it is impossible for this court to conclude that Settlement resulted in a new owner of the Debtor.

Having established that Settlement did not result in a new owner of the Debtor, the court will now examine the second issue of whether Settlement resulted in the installation of a new operator of the Debtor.

### 2. **Sale, Transfer or other Change of Control in Operation of Debtor**

The issue presented here is whether Settlement resulted in a new operator of the Debtor. To prove this, the Claimants must establish that Settlement was "an event of a sale, transfer or other change of control in the . . . operation of the [Debtor]." See Hr'g. Tr. Ex.'s C-1 and C-2 ¶ 5. After reviewing the record, this court finds that Settlement was not an event of a sale, transfer or other change of control in the operation of the Debtor because Whiteley exerted the sole possession of control over the Debtor both before and after Settlement.

Here, the court understands the word "operation" as used here to mean the "exertion of possession of control over something."[12] Accordingly, to prove the existence of a new operator of

---

[12] The word "operation" is a noun that means "an exertion of power or influence." Merriam-Webster's Collegiate Dictionary (11th Ed.) (1581) (2003). The word "power" is a noun that means "possession of control, authority, or

14

the Debtor, the Claimants must establish that Settlement was an event of a sale, transfer or other change of the exertion of possession of control over the Debtor. Review of the record in this case, however, establishes that no such event occurred here because Whiteley exerted the sole possession of control over the Debtor both before and after Settlement. To establish this, the court examines the exertion of control over the Debtor during the relevant time periods in chronological order.

### a. Control over Debtor Prior to Settlement

The record establishes that Whiteley exerted sole possession of control over all aspects of the Debtor prior to Settlement. This possession of control over the Debtor extended not only to the Fitness Center as the Debtor's business, but also to the Debtor itself as a corporate entity. To begin with, the court returns to Whiteley's testimony at the January 8, 2019 hearing on her Objections. When asked if she had any role in the operation of the Debtor, Whiteley responded that she was forced to "step in" in as the "operating partner" around December 2004, after she bought out her partner's interest in the Debtor. See Tr. 38:1-17.[13] This unchallenged testimony is important because it supports a finding that Whiteley, in addition to being the sole shareholder of the Debtor, was also the Debtor's sole operating partner after December 2004.[14] A review of the record confirms this finding and also establishes that Whiteley remained the sole operating partner until April 29, 2016, the date this case was filed.

---

influence over others." *Id*. Combining these definitions reveals that the meaning of the word "operation" as used in paragraph five of the Agreements means "an exertion of the possession of control or authority over the Debtor."

[13] **("**Initially I was a silent investor in the corporation, and I had a partner who was to be the operating partner. The relationship between the two of us soured . . . and I had to step in without much preparation . . . [s]o I became . . . the operating partner."); Tr. 40:15-24 ("the falling out that I had with my partner occurred over the Christmas holiday at the end of December of 2014."); Tr. 42:23-25 ("My partner said no deal; we're walking and then . . . I and the company bought them out.").

[14] Here, the court considers the words "operating partner" to be synonymous with the person exerting possession of control over the Debtor.

For example, the testimony provided in this case proves that Whiteley exerted sole control over employment decisions of the Debtor as evidenced by her decision to authorize the hiring of in-house trainers. See Tr. 44:17-18. She also authorized and controlled the recruitment, retention and oversight of the Claimants. Tr. 41:8-2, 52:1-25, 93:13-25, 94:1-20. In addition, the testimony establishes that Whiteley exerted sole control over the financial aspects of the Debtor as evidenced by her authorization and control of the Debtor's construction contract and financing efforts. Tr. 42:1-7. She was also solely responsible for the marketing and sale of the Debtor's assets in the years leading up to Settlement. Tr. 52:25; 53:1-25; 55:2-11. Finally, the record shows that Whiteley possessed and exerted sole control over the operation of the Fitness Center itself, including her decision to set higher certification standards for her trainers than those of other clubs, and to install procedures to track proper liability insurance, liability waiver retention, and updated client lists. Tr. 45-46.[15] This evidence, and other evidence in the record not cited here, proves that Whiteley unquestionably exerted sole control and authority over all aspects of the Debtor prior to and up to the time of Settlement.

### b. **Control over Debtor After Settlement**

The evidence here also verifies that Whiteley continued to exert the sole possession of control and authority over the Debtor after Settlement. For example, Whiteley, as president of the Debtor, exerted sole control and authority over the Debtor's assets by transferring a $250,000.00 judgment note from the Debtor to herself on December 29, 2014.[16] The judgment note was the Debtor's only asset of value at the time of the transfer. Additionally, Whiteley clearly authorized the Debtor to file the instant bankruptcy case as evidenced by her signature on the voluntary

---

[15] In addition, Ms. Whiteley tracked revenues, compared them to baseline target revenues obtained from workshops she attended on management, and attempted to take corrective action when those target revenues were not met. Tr. 53:13-24; Tr. 54:1-13.
[16] See Adv. Compl. Ex. C.

16

Case 1:16-bk-01897-HWV    Doc 86    Filed 05/10/19    Entered 05/10/19 11:40:34    Desc
Main Document    Page 16 of 18

chapter 7 bankruptcy petition. She has also continued to assert authority and control over the Debtor to the extent allowed and required by the Bankruptcy Code since that time. For instance, she signed the verification of the Bankruptcy Schedules filed in this matter on February 3, 2017 at docket entry number 30, and she attended the section 341 meeting of creditors on behalf of the Debtor on June 27, 2017. Importantly, there is no evidence in the record to indicate that Whiteley shared this possession of control over the Debtor at any time subsequent to Settlement and prior to the filing of the voluntary chapter 7 petition in this case.

In view of these observations, this court finds that the substantial weight of the evidence establishes that Whiteley exerted sole control and authority over all aspects of the Debtor both before and after Settlement. The consequence of this finding is impactful. It establishes that Settlement did not result in the installation of a new operator of the Debtor because it did not represent an event of a sale, transfer or other change of control in the operation of the Debtor. Settlement was not such an event because the transaction between the Debtor and Linglestown did not alter the exertion of possession of control over the Debtor. In view of these observations, the court concludes that Settlement did not result in the installation of a new operator of the Debtor.

Before concluding, the court notes that it is clear from the pleadings, memoranda, testimony, and other evidence that the parties did not anticipate the above findings and conclusions. Perhaps they silently believed the word "Club" had a meaning other than the one prescribed to it by the first paragraph of each Agreement. Exactly what was thought by the parties, however, is not relevant here because the court finds the language of each Agreement clear and unambiguous. Indeed, because it is clear and unambiguous, "the focus of interpretation [must be] upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Steuart*, 444 A.2d at 661.

### IV. Conclusion

This court concludes that the Agreements were in effect at the time of Settlement because the Debtor remained in business at that time and the Agreements had not otherwise been terminated. This court further concludes, however, that the Debtor was not obligated to assign either of the Agreements to Linglestown at Settlement because the conditions required to trigger such an obligation were not met. The clear and unambiguous language of paragraph five of each Agreement requires that a new owner of the Debtor, or a new operator of the Debtor, must be installed as the result of an event of sale, transfer or other change of control in the ownership or operation of the Debtor before an obligation to assign the Agreements is triggered. Because no such event occurred, the Debtor was not obligated to assign the Agreements to Linglestown at Settlement. Since the Debtor was not obligated to assign the Agreements to Linglestown at Settlement, there can be no viable claim for damages resulting from the Debtor's failure to do so. The Objections will therefore be sustained.

An appropriate order will follow.

Dated: May 10, 2019

By the Court,

_____
Henry W. Van Eck, Bankruptcy Judge (LS)